UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        v.                                   (S-1) 16 Cr 506 (ILG)

LAMONT MORAN,

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# SENTENCING MEMORANDUM ON
# BEHALF OF DEFENDANT LAMONT MORAN


Joyce C. London, Esq.
JOYCE C. LONDON, P.C.
59 Maiden Lane. 6th Floor
New York, New York 10038
Tel: (212) 964-3700
Email: jlondonlaw@aol.cm

*ATTORNEY FOR DEFENDANT
LAMONT MORAN*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA

        v.                              (S-1) 16 Cr 506 (ILG)

LAMONT MORAN
            Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## SENTENCING MEMORANDUM ON
## BEHALF OF DEFENDANT LAMONT MORAN

## I.    <u>INTRODUCTION</u>

        This sentencing memorandum is submitted on behalf of defendant Lamont Moran for the

Court's consideration in determining a just and reasonable sentence for Mr. Moran.  For the

reasons set forth herein, the Court is respectfully requested to sentence Mr. Moran a term of

imprisonment of five years - the statutory mandatory minimum.

        On April 24, 2017, Mr. Moran entered a plea of guilty to Count One of the above-

captioned indictment which charged that between March and September 2016, Mr. Moran and

others conspired to distribute and to possess with intent to distribute 100 grams and more of

heroin in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841 (b)(1)(B).

## II.    <u>THE PRE-SENTENCE REPORT</u>

        Objections to the Pre-Sentence Report ("PSR") were submitted to the Probation

Department by letter dated August 28, 2017.  A copy of this letter is attached hereto as Exhibit

A.  Objections to the drug quantity calculation and the two-level enhancement for possession of

a weapon were subsequently withdrawn.

## 1.    <u>Factual Objections</u>

The factual objections with respect to Paragraphs 2, 4 and 24 of the PSR raised in the August 28, 2017 letter to Probation relate primarily to Mr. Moran's role in the offense.  *See infra*.

2.   **Legal Objections**

    a.   Role in the Offense

Pursuant to U.S.S.G. § 3B1.1(a), the PSR accords Mr. Moran a three-level guideline enhancement for his role in the offense claiming that he was the manager or supervisor of a heroin distribution organization that involved five or more participants or was otherwise extensive.  *See* PSR ¶¶ 19 and 37.   This enhancement is not supported by the facts of the case.

Based on the evidence contained in two wiretaps, it is clear that Mr. Moran is a supplier of heroin to a number of customers.  Most of these customers are heroin addicts themselves who purchase minimal quantities (often one bag of heroin at a time).  Generally, it appears that part of this heroin is for personal use and part is sold to fund the next purchase.  These customers either contact Mr. Moran directly when they need to purchase heroin from him or respond to the regular text messages he sends out informing his customers that he has heroin available that day.  Mr. Moran sets the price for which he sells a bag or a bundle (ten bags) of the heroin.  He has no input whatsoever where the purchaser sells the drugs, to whom they are sold or for what price they are sold or, in fact, if any of the drug is sold.  The fact that many of his customers are long-standing addicts on the fringes of society does not, without more, making him a supervisor or manager of these individuals.  Moreover, there are many wiretapped calls where the purchaser informs Mr. Moran that since he (Moran) didn't get back to them or had no supply at that moment, they have purchased or will purchase elsewhere the heroin they need that day.

A defendant is considered a manager or supervisor only "if he exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise lower-level participants." *United States v. Hertular*, 562 F.3d 433, 448 (2d Cir.2009) (internal quotation marks and citation omitted).   On all Sentencing Guidelines issues (with the exception of an enhancement for obstruction of justice, which some caselaw suggests must be established by the government under a clear and convincing standard of proof), the government bears the burden of proving the facts supporting the application of a Guidelines provision, and it must do so by a preponderance of the evidence. *United States v. Kent*, 821 F.3d 362, 368 (2d Cir. 2016) (reversing the district court's application of the § 3B1.1(a) enhancement).  "The  determination of a defendant's role in the offense is to be made on the basis of all conduct  within the scope of §1B1.3 (Relevant Conduct) . . . ." USSG §3B1.1, comment. (intro. commentary).

To distinguish leaders and organizers from mere managers and supervisors,  Application Note 4 provides factors for the Court to consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right  to a larger share of the fruits of the crime, the degree of participation in  planning or organizing the offense, the nature and scope of the illegal activity,   and the degree of control and authority exercised over others.

USSG §3B1.1, comment. (n.4). USSG §3B1.1, comment. (n.4).

Here, the evidence is insufficient to prove Moran was a leader and organizer, or a manager or supervisor. The wiretapped evidence rather reveals Moran's role as a supplier who

4

regularly contacts to see if they need to be re-supplied as he is making his daily deliveries. Alternatively, his customers often contact him to let him know they need to be re-supplied.

*(i)      the exercise of decision-making authority*

What is clear from almost 2,500 pages of wiretap summaries of recorded conversations is that Moran has no decision-making authority over the individuals to whom he supplies heroin.  They notify him when they need a new supply.  He has no decision-making authority over to whom they sell, where they sell, for how much they sell the heroin, how much of the heroin they sell or, in fact, whether they even sell it at all since the majority of his customers are long-standing addicts who purchase minimal quantities of which they generally use part themselves and then sell the rest in order to cover their fix for the next day.

Particularly corroborative of Moran's lack of decision making authority is the Complaint filed in this matter.  *See* Complaint at ¶¶ 24 - 79.  (A copy of the Complaint is attached hereto as Exhibit B).  The Complaint notes that between June 2016 and August 2016, law enforcement intercepted thousands of communications to and from Moran's telephone and then summarizes a subset of those calls and text messages.  Complaint at ¶ 26.  These calls firmly illustrate the supplier-customer relationship and are simply not indicative of a leader or manager supervising employees.

*(ii) the nature of participation in the commission of the offense*

As noted *supra* and as evident in the wiretapped conversations, Mr. Moran's role in the offense is that of a supplier.  The persons to whom he supplies are independent sellers. Moreover, as a supplier he does not have a team or group of employees who assist him in his

daily supply rounds.

*(iii)  the recruitment of accomplices*

The PSR states that "Moran paid Young for finding him customers".  PSR ¶¶ 4 and 24.

This is not factually correct.  Rather Moran and Young had a conversation on July 13, 2016 in

which Young, a/k/a "Kareem" who has just resolved a pending criminal case in State Court

is anxious to get his own business back on track.  He wants Moran to front him some heroin

to sell and promises to pay Moran the money he already owes him from prior sales.   He

states:

K:      Yo L, I gave you my word that I got that for you man, you hear me, I got somebody
        that's willing to do the foot running and I got my own spot now and he also told me
        he got somewhere to put it where it won't be in the house no kinda way so that's
        even better for me and if I can work that out and get back on line with you and with
        him.  We good.  We gonna be good. . . . .

Moran responds:

LM:     Well I got all faith in you man starting with two smakeroos.  Maybe if something
        comes up you might throw a little extra.  Who knows?

A copy of the linesheet transcript of this recorded conversation is attached hereto as

Exhibit C.  Again this conversation is reflective of a supplier-customer relationship, not an

employer-employee relationship.

*(iv)     the claimed right to a larger share of the fruits of the crime*

Based upon a review of the telephone interceptions there is no evidence to suggest

that Mr. Moran claimed a right to a larger share of the proceeds.  He sells the heroin at a set

price per bag or per bundle - a price which he is willing to discount if the purchaser is

prepared to buy either an entire bundle (10 bags) or a larger quantity.

*(v)  the degree of participation in  planning or organizing the offense*

Moran's planning relates only to the conduct of his own business.  Whenever he has a fresh supply of heroin, he sends a text message to his various customers alerting them that he has product for sale.  The only planning is reflected in phone conversations when Moran and a buyer work out a time to meet place to meet to conduct the transaction or for Moran to be paid.  He has no workers whereby he makes daily rounds to collect from them the money they have made from their sales and then pays them based upon what they have sold.  Rather the recorded communications all reflect buyer-seller transactions.  Moran has an agreement with the buyer with respect to the price to be paid for the heroin.  There are no communications in which he is instructing others to sell the product at a particular price or complaining that the person who buys the heroin from him is now selling it at a price that is too low.  He is removed from what quantity his buyer then sells the heroin for, where it is sold, when it is sold and at what price it is sold at.

*(vi)   the nature and scope of the illegal activity*

The illegal activity in question involves a small group of individuals who buy heroin from Moran.  He does not co-ordinate the activities of the individuals who purchase from him.  Nor is there any evidence to suggest that the individuals who purchase heroin from him co-ordinate their own selling endeavors.  They are a discrete group of sellers who have their own customers and areas where they sell.  It further appears from the recorded conversations that the buyers, generally users themselves, are not part of any coordinated selling group.

*(vii)   the degree of control and authority exercised over others*

As noted *supra*, Moran exercised no control and authority over others.  He did not control what quantity of heroin his buyers purchased or whether they purchased at all.  He simply alerted the individuals who purchased heroin from him when he had supplies available.  He exercised no control or authority over whether these individuals used the entire product they

bought themselves or used some and sold part or even sold it all.  That was beyond the scope of his involvement with his buyers.  There is no intercepted communication in which he instructs the individuals whom he supplies at what price the heroin is to be sold for.  Rather, the only discussions regarding price are in keeping with the supplier-customer relationship, namely the price which the customer must pay for the drugs he is supplying to them.  Moreover, on the occasions when he was out of supply, his customers would indicate that they would purchase what they needed elsewhere.

Based upon all the intercepted communications, there is simply insufficient evidence to demonstrate by a preponderance that Moran should receive a three-level role enhancement.

b.  <u>The Criminal Livelihood Enhancement is Not Warranted</u>

The PSR accords a two-level criminal livelihood enhancement pursuant to Guideline § 2D1.1(b)(15)(E).  *See* PSR ¶¶ 19 and 35.  This adjustment should not be applied.

Guideline §2D1.1(b)(15)(E) provides that the criminal livelihood enhancement applies:

If the defendant receives an adjustment under § 3B1.1 (Aggravating Role) and if the offense involved 1 or more of the following factors:
. . . .
(E) the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood.

USSG §2D1.1(b)(15)(E).

First, with respect to the first required element, namely the aggravating role enhancement, as set forth *supra,* Moran did not have a leadership role in this offense.  Without such aggravating role enhancement, the criminal livelihood enhancement must fail.  Even if the Court were to conclude, (against the weight of the evidence), that an aggravating role enhancement is warranted, the second required element, namely that the defendant committed

the offense as a part of a pattern of criminal conduct engaged in as a livelihood, cannot be proven by a preponderance of the evidence.

Application Note 20 of Guideline § 2D1.1, subtitled Application of Subsection (b)(15), states that "[f]or purposes of subsection (b)(15)(E), "**pattern of criminal conduct**" and **"engaged in as a livelihood"** have the meaning given such terms in §4B1.3 (Criminal Livelihood).

Application Note 1 of Guideline § 4B1.3 provides:

> **"Pattern of criminal conduct"** means planned criminal acts occurring over a substantial period of time.  Such acts may involve a single course of conduct or independent offenses.

Application Note 2 of Guideline § 4B1.4 provides:

> **"Engaged in as a livelihood"** means that (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (e.g., , the defendant engaged in criminal conduct rather than regular legitimate employment or the defendant's legitimate employment was merely a front for the defendant's criminal conduct.

With respect to the first element, the indictment charges Mr. Moran with the distribution of heroin over a six-month period.  Research of Second Circuit and associated district court case law has revealed no guidance with respect to "substantial period of time".  However, it is submitted that in the context of criminal livelihood a six-month period falls short of constituting the requisite "substantial period of time."

On the second element regarding the income received from the offense, given the minimum wage during the relevant time period here ($7.25 per hour), the income derived from

9

the criminal conduct over a twelve-month period would have to exceed $14,500.  Even assuming that such an amount of income is established by a preponderance of the evidence, there still must be proof that the criminal conduct was the offender's primary occupation over a twelve-month period, not simply that income derived from the criminal activity was greater than that derived from legitimate employment.

Finally, there is evidence which belies the third required element that the criminal conduct was Mr. Moran's primary occupation in a twelve-month period.  As noted in the PSR, Mr. Moran was employed at The Jacob A. Riis Neighborhood Settlement House in Long Island City as a part-time counselor, mentor and activity specialist from November 1, 2011 until April 16, 2016, earning $14.00/hour.  *See* PSR ¶ 72.  Secondly, as further corroboration of this employment, the PSR notes that Mr. Moran filed federal income tax returns for the years 2011 – 2015.  *See* PSR ¶ 76.  Thirdly, attached hereto as Exhibit D, are letters from the Director of the facility, and two Program Coordinators under whom he worked, not only confirming his employment but also lauding the valuable work that he did while working there.   Finally, although Mr. Moran was unemployed from April to September 5, 2016, during this period, he applied for and received a new counseling at the St. John's Residence and School for Boys in Rockaway Park.  Attached hereto as Exhibit E is a letter from the Human Resources Director of St. John's confirming this employment.[1] *See also PSR ¶ 70.*  Thus, Mr. Moran clearly has a long and established history of legitimate employment.

By any measure, Mr. Moran's primary occupation was his work at the community settlement house over any twelve-month period that might include his criminal activity.  This

---

[1] Although this letter states that Mr. Moran's employment was to commence on October 11, 2016, he had his first day of training for the job, the day before his arrest in this case.

was not "merely a front" for the criminal conduct, but was wholly separate and was, in fact, his

primary occupation.

Accordingly, based on the evidence submitted herein, the two-level criminal livelihood

enhancement is not justified and should be removed from the guidelines calculations.

## III.    AN EXAMINATION OF THE 18 U.S.C. § 3553(a) FACTORS MAKE
      CLEAR THAT A NON-GUIDELINES SENTENCE IS APPROPRIATE

In imposing sentence, this Court must consider the factors set forth in 18 U.S.C. §
3553(a), which include:
     (1) the nature of and circumstances of the offense and the history and characteristics of the
defendant;
     (2) the need for the sentence imposed –
          A. to reflect the seriousness of the offense, to promote respect for the law, and to
provide just punishment for the offense;
          B. to afford adequate deterrence to criminal conduct;
          C.  to protect the public from further crimes of the defendant; and
          D.  to provide the defendant with needed educational or vocational training, medical
care, or other correctional treatment in the most effective manner;
     (3)    the kinds of sentences available;
     (4)    the advisory Guidelines range;
     (5)    any pertinent policy statements issued by the Sentencing Commission;
     (6)    the need to avoid unwarranted sentence disparities; and
     (7)    the need to provide restitution to any victims of the offense.

*Id.*  After considering all of those factors, this Court must "impose a sentence sufficient, *but not*

*greater than necessary*, to comply with the purposes set forth in paragraph (2)." *Id.* (Emphasis

added)

## 1. Nature and Circumstances of the Offense

The specific offense conduct is set forth in the PSR, *see* PSR ¶¶ 6 - 15, and will not be

repeated herein.  Particularly relevant, however, are two factors.  The first is that according to the

lab reports provided in discovery, some of the heroin distributed by Mr. Moran contained the

dangerous synthetic heroin compound known as fentanyl.  Significantly, Mr. Moran only became

11

aware of this after his arrest and did not knowingly distribute fentanyl. The second factor is how Mr. Moran became involved in the instant offense.  This is directly related to his personal family history.  *See infra*.

2. **History and Characteristics**

Lamont Moran was born into a family beleaguered by psychiatric illness, addiction, alcoholism and violence. His father, a confirmed addict, played no role in the support, care or upbringing of the family.  His role appears limited to that of sperm donor.   Mr. Moran's mother, herself the daughter of a violent alcoholic mother, has a documented history of violence starting in elementary school.  By her early teenage years, she had been expelled from two schools for stabbing other students and because she was a danger to others on account of repeated violent incidents, including turning over desks and throwing chairs in the classroom.  She became pregnant by age 15 and her first child was born when she was 16.  She reports that by age 16, she was using crack daily, smoking marijuana daily and already an alcoholic.  Her second child was born when she was 17.   Lamont arrived into the chaos they called "home" when his mother was 23 still addicted, still violent, and still incapable of mothering or care giving.  As noted in the PSR, he was hospitalized when he was only three years old after overdosing on pain killers that were left within his reach in the house.  Reportedly, he was in a coma for two weeks.  Soon thereafter, he and his siblings were placed in foster care for about a year. [2] Within about a year of returning home, he and his siblings were placed in a second foster home for similar reasons. He describes this experience as "horrible".  His primary memory of the second foster care experience is the constant hunger.  Family court documents provided to Probation by Mr. Moran's mother paint a bleak picture of years of neglect and severe maltreatment, inadequate nutrition for the children,

ongoing violence including reports of Mr. Moran being burnt with a curling iron, hit with a glass bottle and having bite marks on this body.

The first positive element in Mr. Moran's nightmare childhood came when he was around 14 and placed in a third foster care home.  Here, for the first time in his life, he had a caregiver, Avalyn Simon, who showed concern for him and a desire to see him succeed.  Under her guidance, he was able to graduate high school – the only person in his family to do so. He also started attending college, first at Nassau Community College, then upstate at Herkimer Community College acquiring 60 community college credits with a social work major. A very thoughtful letter from Ms. Simon, attached hereto as Exhibit F, details the remarkable progress and potential that Mr. Moran showed when provided with a caring, supportive and structured environment.

Mr. Moran stopped attending college in Herkimer before graduating for financial reasons and returned to the Simon household.  Soon thereafter, he obtained a part-time teacher's assistant/mentoring job at CityYear AmeriCorps which he maintained for a year.  He then moved from the Ameri-Corps job to his position at the Jacob Riis Settlement House which he maintained for almost six years.

At around age 22, he left the Simon household and returned to his mother's apartment. Now that he was working in the social service sector, he felt a strong need to do all he could to assist his own family and hold together a frayed family unit as addiction, alcoholism and violence continued to dominate their lives.  As the only "sane" member of the family, they constantly turned to him for their endless needs.  His younger sister Jessica, although not addicted like her mother, yet mentally ill and prone to violent outbursts like her mother, now had children she was incapable of caring for.  Mr. Moran was expected to step in and become the care giver to this

---

[2] He was too young to remember anything about this experience.

seriously dysfunctional household, including his sister's children.  The emotional and financial

demands on him were endless and way beyond his capabilities leading eventually to his

involvement in the instant case.

His attempts to "save" his family have not gone completely unrewarded.  Through his

urging, Mr. Moran's mother has made consistent efforts to overcome her addiction and alcoholism

and receive treatment for her mental illnesses.  She has made tremendous progress having now

obtained her GED and for the first time in her life become gainfully employed.  A letter, attached

hereto as Exhibit G attests to this progress.

Mr. Moran's positive impact on those who have come to know him both at work and

socially is reflected in letters attached hereto as Exhibit H.  Crystal clear through all these letters

and acting somewhat as a counterbalance to the harm he has perpetrated on society through the

distribution of heroin is his ever-present genuine concern for and desire to help others and the fact

that he has had a meaningful impact on many young lives.

**3.**  **The Remaining Factors of 18 U.S.C. §3553(a)**

a.  Individual Deterrence

With respect to protect society from future crimes of this defendant, it is noteworthy that

this is Mr. Moran's first criminal conviction – extraordinary in light of the fact that all the adult

role models in his family have lived lives of criminality and substance abuse.    During the past 15

months of Mr. Moran's incarceration, he has given considerable thought to his family situation and

the need for him to deal with their constant demands only to the extent that he capable.  He has

come to understand that saying "no" to them when he cannot meet their endless needs is not a

betrayal of his family as they would have him believe.  However, it is recommended that upon his

14

release, mental health counseling should be made available to him so that he can have a support system to assist him in dealing with his dysfunctional family whom he wants to remain a part of his life.

He was gainfully employed from the time he stopped attending college until the day of his arrest, with the exception of a six-month hiatus during the time period of the instant offense. Significantly, he was about to start a new job when he was arrested in this case. From all accounts, he was an excellent counsellor and mentor to the youth in the programs for which he worked. Regrettably, he dissociated the good advice he gave his mentees from his own conduct. However, there is no suggestion that he ever tried to sell narcotics within the facility where he worked.

Additionally, during his pre-trial detention, Mr. Moran has received no disciplinary infractions and has attended several programs including a course in resume writing and job interview skills. Also during his pre-trial detention, he has given serious thought to his situation and the circumstances that led him to make the poor decisions resulting in these charges. His insights and self-awareness as set forth in his letter to the Court, attached hereto as Exhibit I, bode well for his ability to have a law-abiding and productive future.

b.   General Deterrence

In this case, Congress has sent a loud and clear message of general deterrence by setting a mandatory minimum sentence of five years for this crime. The fact that Mr. Moran faces a five-year mandatory sentence by statute with no possible reprieve is sufficient to serve as a general deterrent for those contemplating similar criminal conduct.

c.   Need for Educational or Vocational Training and Medical
            or Substance Abuse Treatment

15

Given Mr. Moran's has a history of marijuana and alcohol usage, it is respectfully requested that the Court recommend that Mr. Moran participate in the Bureau of Prisons Residential Drug Abuse Treatment Program ("RDAP").

## IV.  A REASONABLE SENTENCE

It is respectfully submitted that under all the facts and circumstances detailed herein and in the PSR, Mr. Moran should receive a sentence below the recommended guideline range. Throughout much of his childhood and formative years, he suffered unimaginable abuse at the hands of his addicted and mentally ill mother.  His father contributed to the abuse by his absence and abdication of any manner of support.  His parents failed him and his older siblings failed him. For most of his young life, no-one was present to teach him right from wrong but many were there to teach him wrong and show him wrong by example.  Spending most of his teenage years in a loving and responsible foster care home was a lifeline that has shown him that he can be successful.

In light of his personal history, this offense appears to be aberrant conduct on Mr. Moran's part – unlikely to be repeated. Given his successful prior work history and his education against all odds, his future looks more optimistic than his past could have predicted. Accordingly, a mandatory minimum sentence is one which is sufficient but not greater than necessary to fulfill the statutory goals of sentencing.

## VI.  CONCLUSION

For all of the reasons set forth above, it is respectfully submitted that a sentence of five

years, the mandatory minimum, constitutes a just and reasonable sentence for Mr. Moran.

Dated:  New York, New York
           December 10, 2017

                                                    Respectfully submitted,
                                                              /s/

                                             Joyce C. London, Esq.
                                             JOYCE C. LONDON, P.C.
                                             59 Maiden Lane, 6th Floor
                                             New York, NY 10038
                                             Tel: (212) 964-3700
                                             Email: jondonlaw@aol.com

                                             *Attorney For Defendant*
                                             *Lamont Moran*

17