

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MEG/MJJ                                          *271 Cadman Plaza East*
F. #2016R00506                                   *Brooklyn, New York 11201*

December 14, 2017

By ECF

The Honorable I. Leo Glasser
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Lamont Moran
             Criminal Docket No. 16-506 (S-1) (ILG)

Dear Judge Glasser:

        Defendant Lamont Moran is a gang-affiliated drug trafficker who ran a heroin distribution operation in Jamaica, Queens from 2015 to 2016. He managed and supervised street-level dealers—including at least one known gang member and several elderly heroin addicts—and, like many drug dealers in New York City, the defendant carried firearms. In addition to running a heroin distribution operation, the defendant also sexually exploited a 16-year-old high school student, whom he filmed performing sex acts.

        In September 2016, the defendant was arrested on heroin distribution charges, and in April 2017, he pled guilty to conspiring to distribute more than 100 grams of heroin, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B) and 846. For the reasons set forth below—namely, the defendant's heroin trafficking, gang affiliation, firearms possession and sexual exploitation of a minor—the government submits that a Guidelines sentence is warranted.

I.      Background

        In early 2016, the Federal Bureau of Investigation ("FBI") and the New York City Police Department ("NYPD") began an investigation into gang-related crimes and heroin trafficking near the Baisley Park Houses—a New York City Housing Authority ("NYCHA") complex in the South Jamaica neighborhood of Queens. (Presentence Investigation Report ("PSR") ¶ 2.) The Baisley Park Houses is comprised of several medium-rise buildings containing approximately 400 apartments and an estimated 1,000

residents.  Like many NYCHA complexes in this District, the Baisley Park Houses are plagued by gang violence, gun crime and narcotics trafficking.

The investigation focused principally on members of the violent street gang "Get it in Stacks" (also known as "GI$")—a subset of the notorious Bloods gang operating in and around the Baisley Park Houses—and the defendant, a heroin trafficker affiliated with GI$.  (Id. ¶ 5.)

Between March and June 2016, the FBI used a confidential source (the "CS") to more than 15 controlled purchases of heroin from the defendant.  (Though, as described in greater detail below, on more than one-third of those occasions, the defendant actually sold the CS fentanyl—a deadly synthetic opioid significantly more potent than heroin.)  The heroin and fentanyl the defendant sold the CS was often stamped with brand names, such as "Batman," "Call of Duty" and "Sleepys."

The FBI also wiretapped (pursuant to Court authorization) two cell phones the defendant used to run his heroin distribution operation.  (Id. ¶ 3.)  Like many drug traffickers, the defendant relied on "burner" phones and changed his telephone number regularly, presumably to avoid detection by law enforcement.  Despite these efforts, however, the FBI managed to successfully intercept thousands of the defendant's heroin-related communications over a period of approximately seven weeks.

The frequency and nature of these communications revealed that the defendant trafficked heroin on a full-time basis.  The interceptions also revealed that the defendant not only sold heroin directly to customers, but that he also supervised and managed the heroin sales of several subordinate dealers, including codefendants Dennis Pristell and David Young.  (Id. ¶¶ 2-3.)

Agents obtained additional evidence of the defendant's heroin trafficking activities during the course of the investigation.  In February 2016, for example, NYPD officers arrested GI$ members Lashawn Douse and Joclyn Bridges in connection with the nonfatal shooting of a rival Crips gang member in the Baisley Park Houses.[1]  A post-arrest search of Bridges's cell phone (pursuant to a court-authorized search warrant) revealed dozens of text messages with the defendant from December 2015 until February 2016 related to heroin trafficking.

The FBI arrested the defendant in September 2016, approximately six months after the investigation began, while he drove to meet the CS for yet another controlled delivery.  Agents found heroin on the defendant and in his car.

---

[1] Douse was released soon after his arrest and never charged for his role in the shooting. Bridges was initially charged in connection with the shooting, but those charges were dismissed after Bridges pled guilty to heroin distribution—stemming from an unrelated arrest in early 2016—and was sentenced to several years' imprisonment.

The defendant's post-arrest statements revealed a callous disregard for the addicts who bought his heroin. The defendant acknowledged heroin's dangerousness and, to demonstrate this awareness, stated that he never used it himself: "I don't this use shit. I don't touch this shit."[2] But at the same time, he made clear that making money was more important to him than the wellbeing of the people who bought heroin from him. "I don't view it as drugs, I view it as money," the defendant told agents, adding that he treated this "as a business."

The content of the defendant's cell phone—seized incident to his arrest and searched pursuant to a warrant—underscores both his dangerousness and utter disregard for the law. For example, and as described in greater detail below, photographs from the defendant's phone revealed that he possessed multiple firearms. In addition, photographs of the defendant with GI$ gang members—including a photograph of him next to Douse, who is brandishing a firearm (attached as Exhibit J)—confirmed the defendant's affiliation with GI$.

Disturbingly, photographs and video from the defendant's phone also revealed that he engaged in an ongoing, sexual relationship with a 16-year-old high school student, whom he filmed performing oral sex on him. This video constitutes child pornography, and by producing it, the defendant violated 18 U.S.C. § 2251(a)—a statute which carries a 15-year mandatory minimum sentence.

In October 2016, the defendant was indicted for distributing and possessing with intent to distribute more than 100 grams of heroin, and conspiring to do the same, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B) and 846. In April 2017, the defendant pled guilty (without a plea agreement) to one count of conspiring to distribute and possess with intent to distribute more than 100 grams of heroin.

II.     Applicable Law

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted); see also United States v. Booker, 125 S. Ct. 738, 743 (2005) (although the Guidelines are advisory, district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence).

Next, courts should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the

---

[2] The defendant never tested positive for heroin.

facts presented." Gall, 552 U.S. at 50 (citation and footnote omitted).  Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of [18 U.S.C. § 3553(a)(2)]."  The factors courts shall consider in imposing sentence include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as well as the need for the sentence imposed to:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B)   to afford adequate deterrence to criminal conduct;

> (C)   to protect the public from further crimes of the defendant; and

> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In imposing sentence, the Court may consider any information relating to the defendant's background, character and conduct.  Indeed, 18 U.S.C. § 3661 expressly provides that, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

III.    The Defendant's Guidelines Calculation

The Probation Department initially calculated the defendant's Guidelines range to be 121 to 151 months, based on a total offense level of 32 and a Criminal History Category of I.  (PSR ¶¶ 33-43.)  In an addendum filed on December 13, 2017, the Probation Department presented a revised Guidelines range of 97 to 121 months, based on an amended total offense level of 30.  The government agrees with the Probation Department's initial calculation.

The Probation Department arrived at its initial Guidelines range by applying a base offense level of 28—corresponding to a heroin quantity of between 700 and 1000 grams—plus the  following three specific enhancements: (1) a two-point enhancement for possession of one or more firearms; (2) a three-point enhancement based on the defendant's role as a manager or supervisor in criminal activity involving five or more participants; and (3) a two-point enhancement for committing the offense as part of a pattern of criminal conduct engaged in as a livelihood.  (The Probation Department's revised Guidelines range does not include the two-point criminal livelihood enhancement.)

4

The defendant initially objected to the base offense level and all three enhancements, but has since withdrawn his objection to the base offense level and the firearm enhancement. The defendant's remaining objections relate to the role enhancement and criminal livelihood enhancement. For the reasons below, these objections are meritless.

A.   <u>The Defendant Supervised and Managed Street-Level Heroin Dealers</u>

The defendant admits that he supplied heroin to "a number of" lower-level street dealers who, in turn, resold that heroin to end-users. (Defendant's Sentencing Memorandum ("Def. Mem.") at 5 (describing the defendant as a "supplier"); <u>see also</u> Defendant's PSR Objections ("Def. Obj.") at 2 (the defendant "supplied heroin to a number of individuals").) Nonetheless, the defendant claims that he should not be deemed to have supervised or managed these street-level dealers because they operated "independently" of him. (Def. Mem. at 5; Def. Obj. at 2.)

The evidence, however, tells a very different story. Numerous wiretap interceptions show that the defendant supervised and managed lower-level dealers— including codefendants Dennis Pristell and David Young—who distributed the heroin (and fentanyl) the defendant supplied them. These wiretap recordings refute the defendant's claim that he only had a "supplier-customer" relationship with his subordinates. (Def. Mem. at 5.)

On June 25, 2016, for example, Pristell told the defendant that one of their customers "just came and grabbed eight . . . baseball hats"—code for eight units of heroin— but that the customer was dissatisfied ("they don't snap back right like Batman"[3]), so the customer asked for his money back.

| | |
|---|---|
| PRISTELL: | Man [inaudible] just came and grabbed eight mother fuckin' baseball hats shit right, and then turned around and said—yo, he tried to see if it fit him cause, like, nah—they don't snap back right like Batman. Said man [inaudible] turn around and he gave me the mother fuckin' money back— god damn. |
| DEFENDANT: | Oh, ok, he wanted a refund. |
| . . . | |
| DEFENDANT: | Alright, well D[ennis Pristell], I gotta, um um um—I'm a try and get the Batman. |

---

[3] Batman was a brand name of heroin the defendant frequently sold, including to the CS.

> PRISTELL:        You got to get that man, cause you know what
>                  I'm saying—cause that was operable.

This exchange is inconsistent with the defendant's claim that Pristell was simply one of the defendant's heroin customers.  Pristell provided the defendant with a detailed description of a customer's dissatisfaction with the defendant's product—much in the way any retail employee would inform a manager about a customer complaint.

Two days later, on June 27, 2016, Pristell told the defendant that the police nearly arrested him and that he flushed the defendant's heroin down the toilet.  Significantly, in response, the defendant told Pristell that "you got to eat that shit"—meaning that Pristell would have to pay for the lost heroin.

> PRISTELL:        [T]he police come in . . . .  they want to come in
>                  the bathroom.  I sat there and dropped my mother
>                  fucking heroin—I threw that shit in the toilet—
>                  eight pieces.
>
> DEFENDANT:       Oh, ok, you got to eat that shit.

This exchange makes clear the defendant provided heroin to Pristell on credit or consignment, and that Pristell was expected to return some or all of the profits to the defendant.  If, as the defendant claims, Pristell was simply a heroin customer operating "independently of him" (Def. Obj. at 2), then Pristell would have paid for the heroin in advance—like any normal customer—and the defendant would not have cared whether Pristell used the heroin, resold it, or flushed it down the toilet.

This exchange—like the June 25 call about the unsatisfied customer— undermines the defendant's central claim that he had no continuing interest in the heroin he supplied street-level dealers like Pristell.  To the contrary, the defendant retained a significant pecuniary interest in that heroin, which is precisely why Pristell notified the defnedant when a customer demanded a refund and when a police raid resulted in the loss of inventory.

The defendant argues that the supervisory role enhancement is unwarranted, in part, because he did not "collect from [his street-level dealers] the money they have made from their sales . . . ."  (Def. Mem. at 7.)  Wiretap recordings disprove this claim.  During a call between the defendant and Pristell on July 1, 2016, for example, the defendant told Pristell that he would pick up "bread" (i.e., money) from Pristell before resupplying him with "some shit" (i.e., heroin):

> I'm trying to see you to pick that bread up and then come back
> to see you with some—with some shit. . . .   [B]eing that I'm
> close to you—I'm trying to come take this bread, go pay for
> what I got to pay for, and then come back to you.

The defendant also argues that the supervisory role enhancement is unwarranted because there was never a time where he "complain[ed] that the person who buys heroin from him [e.g., Pristell] is now selling it at a price that is too low."  (Def. Mem. at 7.)  This argument ignores that the defendant did complain about Pristell's job performance—specifically about his lack of sales.  During a series of calls and text messages between the defendant and Pristell on July 4, 2016, the defendant got angry at Pristell for going on vacation without telling the defendant in advance.

DEFENDANT:      Call me please man.

PRISTELL:       I have my ringer off[.]  I'm downtown Tampa, checking out the fireworks . . . .

DEFENDANT:      Ah man, you went out of town on me, bro? . . . Yo when u comin back?

PRISTELL:       Next week. . . .

DEFENDANT:      Yo, why u do that?  U coulda not took that and waited.  U holdin me up.

PRISTELL:       My people's got me a ticket.  I got call to go to the airport.

DEFENDANT:      So I jus gotta wait a whole 2 wks?

. . .

DEFENDANT:      That's not good for biz.  Im not about ya vaca[tion] but u could have sent that back my dude.

PRISTELL:       One week.

DEFENDANT:      U killin me big dog.

If, as the defendant contends, Pristell was simply a customer who resold the defendant's heroin "to whomever and whenever [Pristell] chose" (Def. Obj. at 2), then the defendant would not have cared that Pristell left New York City without informing him in advance.  Instead, the defendant asked Pristell "why u do that?" and told him that "U coulda not took that and waited.  U holdin me up."

In other words, the defendant told Pristell that he should have declined to accept heroin from the defendant before Pristell left town so that the defendant could have sold it in Pristell's absence.  Again, if Pristell had purchased this heroin from the defendant like a normal customer, the defendant would not have cared how he disposed of it or how quickly—and certainly would not have complained about Pristell going on vacation.  And, if

any doubt remained about the employer-employee nature of the defendant's relationship with Pristell, the defendant removed it by telling Pristell that his unannounced departure was "not good for biz."

Two days later, on July 6, 2016—while Pristell was still out of state—the defendant called Pristell and told him to contact his customers ("call your peoples") so that the defendant could deliver heroin directly to them in Pristell's absence.

| | |
|---|---|
| DEFENDANT: | [C]all your peoples.  See if anybody was ringing you up to grab something. . . . |
| PRISTELL: | I know you got Call of Duty [i.e., a brand of heroin the defendant sold to the CS].  Yeah.  Ok. Let me make a phone call, couple of phone calls. |

This exchange shows the defendant directing Pristell to take a specific action, and Pristell complying with the directive.  If, as the defendant claims, Pristell was an "independent seller[]" (Def. Mem. at 5), Pristell would have been reluctant to simply hand over his customer list to the defendant—thereby, eliminating the need for him to continue playing a middleman role.  The much more plausible explanation—and the one supported by the wiretap evidence—is that Pristell worked for the defendant as a street-level dealer, and in Pristell's temporary absence, the defendant decided to make the street-level deliveries himself instead of foregoing profits.

Other intercepted calls confirm that the defendant had an interest in Pristell's sales and refute the defendant's contention that he never "complain[ed]" about Pristell's job performance.  (Def. Mem. at 7.)  On July 18, 2016, for example, the defendant became angry with Pristell after Pristell failed to charge his telephone and missed numerous calls from customers.

| | |
|---|---|
| PRISTELL: | Yea, I just got up and I had missed 12 phone calls. |
| DEFENDANT: | I knew it man. . . . |
| . . . | |
| DEFENDANT: | Why in the hell would you do that?  The money supposed to wake you up. |
| PRISTELL: | Shit, ain't had nothing but a couple of pieces [unintelligible] that's why I was calling you. . . .  I know what happened.  I didn't charge my damn phone. |
| DEFENDANT: | Come on D[ennis Pristell] what kind of business are you running man. |

This exchange again demonstrates the defendant's supervision of Pristell.  Specifically, the defendant criticized Pristell for falling asleep and missing calls from 12 customers: "Why in the hell would you do that?  The money supposed to wake you up. . . .  Come on D[enis Pristell], what kind of business are you running, man?"  If the defendant, as he claims, had no financial interest in Pristell's downstream heroin sales, then the defendant would not have cared whether Pristell missed customers' calls.

Pristell was not the only street-level dealer the defendant supervised.  Wiretap evidence shows that the defendant had a similar relationship with codefendant David Young. According to NYPD records, on April 14, 2016, Young was charged with criminal possession of a controlled substance after NYPD officers executed a search warrant at his residence and found, among other things, glassines of heroin bearing the label "Sleepys"— one of the defendant's heroin brands.  On July 13, 2016, Young's charges were disposed of by a misdemeanor plea and a conditional discharge.  Hours after his release, Young called Moran to resume working for him:

| YOUNG: | Yo, what up boy. It was a good day for the brother, man.  Stay out of trouble for a year. Dropped to a disorderly conduct. |
| --- | --- |
| | . . . |
| | Listen, D [i.e., Dennis Pristell] is back and he text me to tell me that he got some shit "Call of Duty" [i.e., one of the defendant's heroin brands].  You know anything about that? |
| DEFENDANT: | Yea.  I know a lot about it. |
| YOUNG: | I figured that. So I definitely got to show you some face because I don't know how good it is but I'm pretty sure that it is.  I have a person that I'm renting a room from and he's willing to rock the boat so I'm going to get this paper to you as fast as I can, see if we can get back on track man. |
| | . . . |
| | I want to get back onboard.  I don't ever want to stop making money.  I felt that what we had was damn good.  We went from one to 10 to 20 to 30. |
| DEFENDANT: | That's good. |

YOUNG:              And it didn't take no long time to get there man, so I know you're able to put your hands on it and you already know I know how to get rid of it. . . . Cause ni\*\*as still call my phone asking.  I got a group of people out here that have been using me.  [Young] you ain't got to do nothing.  All you got to do is when your customers call you, you call me and I will send my people to them to see them and I will give you something for doing that.

During this call, Young told the defendant that he wants to "get back on track . . . back on board.  I don't ever want to stop making money.  I felt that what we had was damn good.  We went from one to 10 to 20 to 30."  These statements confirm that Young and the defendant were working together before Young's April 2016 arrest and that they had a profitable business relationship.  Later in the call, Young explained to the defendant that he could resume his role as a recruiter in exchange for payment:  "when your customers call you, you call me, and I will send my people to them to see them, and I will give you something for doing that."

Wiretap interceptions in August 2016 confirm that Young did, in fact, resume working for the defendant.  On August 16, for example, Young sent the defendant a text message, "Come c me I'm [al]ready down to 2," and the defendant responded "ok."  In other words, Young texted the defendant to tell him that his heroin supply was low ("down to 2") and the defendant agreed to resupply Young.

On August 21, the defendant called Young to "check up on [him]," further demonstrating the supervisory role he played:

DEFENDANT:     So I had to check up on you and see if everything's good.

YOUNG:              No doubt man, I appreciate that, I think I got like two of them joints left. . . .  Two rolls left and I got like 300 and something.

In response, Young told the defendant that he had a specific quantity of heroin left ("two of them joint left . . . [t]wo rolls left") before telling the defendant how much money he made from the sales: "300 and something."  This exchange—like those with Pristell described above—refutes the defendant's contention that he had no continuing interest in the heroin he provided Young or in the money Young made selling the defendant's heroin.

This was not the only time Young reported to the defendant both how much money he had made and how much heroin remained in his supply.  On August 26, for example, Young texted the defendant, "I got 200 a[n]d two left come hala at ur boy"— meaning that Young had $200 to give the defendant and that he was down to his last two units of heroin.  The fact that Young regularly reported to the defendant both his current

10

level of supply and the money he made selling the defendant's heroin is inconsistent with defense counsel's argument that Young was an "independent seller[]."  (Def. Mem. at 5.)

B.      The Defendant Engaged in a Pattern of Criminal Conduct as a Livelihood

U.S.S.G. § 2D1.1(b)(15)(E) provides for a two-level enhancement for offenses committed as a part of a pattern of criminal conduct engaged in as a livelihood.  Application Note 20 to §2D1.1, states that "[f]or purposes of subsection (b)(15)(E)" the terms "pattern of criminal conduct" and "engaged in as a livelihood" have the meaning set forth in U.S.S.G. § 4B1.3.

Application Note 1 to U.S.S.G. § 4B1.3, in turn, provides that a "pattern of criminal conduct means planned criminal acts occurring over a substantial period of time. Such acts may involve a single course of conduct or independent offenses."  Application Note 2 of U.S.S.G. § 4B1.4 defines "engaged in as a livelihood" to require that

(A) the defendant derived income from the pattern of criminal conduct that in any twelve month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period . . . .

The defendant claims the criminal livelihood enhancement should not apply primarily because (1) "the offense conduct charged here occurred over a six month period of time, namely from March to September 2016 . . . hardly a substantial period of time" (Def. Obj. at 3); and (2) such criminal conduct was not the defendant's "primary occupation." Both arguments are meritless.

1.      The Defendant's Heroin Distribution Occurred Over a "Substantial Period of Time"

The defendant concedes that the defendant sold heroin on a "daily" basis for a six-month period (Def. Mem. at 5 and 6), but nonetheless contends that this does not constitute a "substantial period of time," (id. at 9).  This argument fails for several reasons.

First, while the Guidelines do not define the term "substantial period of time"—and the Second Circuit has not addressed its meaning—every circuit court to construe the phrase has held that a period of several months can constitute a "substantial period of time."  In United States v. Irvin, for example, the Tenth Circuit held that "substantial period of time" requires only something "more than a short, quick, one-time offense."  906 F.2d 1424, 1426 (10th Cir.1990) (holding that a five to seven month period constituted a "pattern of criminal conduct").  The Fifth, Sixth, Seventh and Eighth Circuits have all reached the same conclusion.  See United States v. Luster, 889 F.2d 1523, 1531 (6th Cir.1989) (three months); United States v. Hassan, 959 F.2d 236 (6th Cir. 1992) (three and

11

one half months); <u>United States v. Hearrin</u>, 892 F.2d 756, 760 (8th Cir. 1990) (eight months); <u>United States v. Cryer</u>, 925 F.2d 828, 830 (5th Cir.1991) (affirming application of § 4B1.3 to conduct that lasted four months, and stating that § 4B1.3 "requires only that '[the pattern of] criminal conduct' be the defendant's 'primary occupation' during the relevant twelve-month span, not that the defendant engage in crime for an entire year"); <u>United States v. Bueno</u>, 703 F.3d 1053, 1067 (7th Cir. 2013) (seven months), <u>vacated on other grounds</u>, <u>Gonzalez-Zavala v. United States</u>, 133 S. Ct. 2830 (2013).

   Second, evidence establishes that the defendant's criminal conduct preceded the March 2016 to September 2016 time-period charged in the indictment.  As noted above, text messages recovered from the phone of one of the defendant's heroin dealers—GI$ gang member Jocyln Bridges[4]—confirm that the defendant was selling heroin in 2015.  In mid-December 2015, for example, the defendant told Bridges (on multiple occasions) to monitor codefendant Young's heroin sales: "Yo big dog, hit both of Reem [<u>i.e.</u>, Young's alias] number for me and ask how's everything looking because he's a little shaky."[5]  On another occasion, in January 2016, the defendant instructed Bridges to tell Young that the defendant was going to be delayed in resupplying Young, and to ask Young how much heroin he had remaining:

| | |
|---|---|
| DEFENDANT: | Tell Reem I'm on alil hold up right now  Ask is he down to 0. |
| BRIDGES: | Yea, he said 0. |
| DEFENDANT: | Damn.  Tell him be outside at 2. You told him[?] |
| BRIDGES: | Yea. |

Later in January, the defendant told Bridges that he might need him to deliver heroin to a regular customer named "Maria":

| | |
|---|---|
| DEFENDANT: | I think I might need you |
| BRIDGES: | For? |

---

[4] Bridges was arrested three times in January and February 2016 for distributing heroin. "Sleepys" brand heroin—one of the brands the defendant sold to the CS—was seized from Bridges incident to his third arrest.

[5] Notably, the defendant's instruction to Bridges to monitor Young's heroin sales refutes the defendant's argument that he did not coordinate the activities of the street-level sellers he supervised.  (See Def. Mem. at 7 ("The illegal activity in question involves a small group of individuals who buy heroin from Moran.  He does not co-ordinate activities of the individuals who purchase from him.").)

DEFENDANT:         Idk [i.e., I don't know.]  Maria I think . . . Ima see

BRIDGES:           Ii8 [i.e., Alright] just let me know.

The defendant's text messages with Bridges establish that his heroin trafficking activity began no later than December 2015—ten months before his arrest.

2.     The Defendant Made More than $14,500 in Profits Selling Heroin as His Primary Occupation from Late 2015 Until His Arrest in September 2016

The defendant does not dispute that he made more than $14,500 in profits from his heroin trafficking activity.  Instead the defendant argues that "[e]ven assuming" he earned this amount,[6] the government has not established by a preponderance of the evidence that trafficking heroin was the defendant's "primary occupation."  (Def. Mem. at 9-10 (citing U.S.S.G. § 4B1.3 Note 2).)  This argument fails for several reasons.

First, the defendant concedes that he had no legitimate employment for the five months preceding his arrest.  (Def. Mem. at 6.)  Indeed, in his own letter to the Court, the defendant specifically states that he left his part-time job at the Jacob Riis Settlement House in April 2016 because of his heroin trafficking business: "I resigned from the Jacob Riis because I was not giving that job my full attention.  I became caught up with the devil's work."  (Def. Mem. Ex. 1 at 3.)  Thus, for at least the five months preceding his arrest, the defendant's heroin trafficking business was not just his "primary" occupation—it was his only occupation.

And unlike all of the defendant's prior purported employment, his heroin trafficking business was not a part-time endeavor.  To the contrary, the CS's interactions with the defendant and the wiretap recordings make clear that heroin trafficking was the defendant's full-time job.  On the 17 occasions when the CS contacted the defendant to buy heroin, the defendant was always available to meet promptly.  And the wiretap recordings show not only that the defendant sold heroin on a daily basis, but that he often worked long hours and weekends.  The defendant himself concedes that he sold heroin on a "daily" basis.

_____

[6] There is extensive evidence that the defendant made more than $14,500 in profits from trafficking heroin in the 12-month period preceding his September 2016 arrest.  As an initial matter, the defendant sold approximately $10,000 of heroin (and fentanyl) to a single customer—the CS—and wiretap recordings established that the defendant sold heroin to dozens of customers and supplied numerous street-level dealers.  The wiretap evidence further shows that the defendant trafficked heroin on a daily basis and at all hours.  Moreover, several photographs of the significant amounts of cash—including the defendant holding a wad of cash hours before his arrest—were recovered from his cell phone.  (See Exhibit A.)  In addition, the defendant boasted about the illicit way he made money.  Prominently displayed on the defendant's public-facing Facebook profile, for example, was the following tagline: "Don't worry bout how I make my money, just know that im making it."  (See Exhibit B.)

(Def. Mem. at 5 (arguing that the defendant was a heroin "supplier who regularly contact[s customers] to see if they need to be re-supplied as he is making his daily deliveries").)

The defendant also appears to argue that trafficking heroin was not his "primary occupation" during the 12-month period preceding his arrest because he worked part-time at the Jacob Riis center during the early part of this 12-month period. As explained in the preceding section, criminal activity need not last a full 12 months to constitute a "primary occupation." In any event, and as noted above, there is evidence that the defendant's heroin trafficking was his primary occupation even before he left his purported employment at Jacob Riis on April 16, 2016. For example, the CS conducted multiple controlled purchases of heroin from the defendant before April 16, and text messages between the defendant and Bridges establish that the defendant was selling heroin in December 2015.

IV:     Discussion

A Guidelines sentence is warranted primarily because of the seriousness of the defendant's crimes and the need to protect the public from him. See 18 U.S.C. §§ 3553(a)(2)(A) and 3553(a)(2)(C).

A.     Seriousness of the Defendant's Crimes

Opioid addiction has reached epidemic proportions in this District and nationwide. Indeed, "[f]rom 2000-2015, the rate of heroin related deaths in the United States has more than tripled, with 12,989 killed in 2015." United States v. Thomas, 255 F. Supp. 3d 400, 405 (E.D.N.Y. 2017) (quoting Understanding the Epidemic, Centers for Disease Control and Prevention[7]). Heroin traffickers, like the defendant, both promote and profit from this epidemic at the expense of the drug addicts they supply and the communities (like Baisley Park) where they sell their products.

The defendant's drug trafficking crimes are especially serious because, in addition to selling heroin, the defendant also sold customers fentanyl—a synthetic opioid approximately 50 times more potent, and significantly more dangerous, than heroin. In fact, on seven of the 17 occasions where the CS attempted to purchase heroin from the defendant, the defendant actually sold him fentanyl—without ever revealing this fact to CS-1.

The defendant claims that "he did not know that the product was fentanyl," (Def. Obj. at 1). But even assuming this is true, it underscores the defendant's reckless indifference to the wellbeing of his heroin customers. Public health officials attribute the skyrocketing numbers of opioid-related overdose deaths in recent years to the proliferation of fentanyl—and its use by heroin addicts. As recently reported in the New York Times, statistics from the Center for Disease Control demonstrate that fentanyl-related overdose

---

[7] Exhibit C at 2 (available at https://www.cdc.gov/drugoverdose/epidemic/index.html).

deaths increased by more than 500% in the last three years.  See The First Count of Fentanyl Deaths in 2016: Up 540% in Three Years, N.Y. Times (Sept. 2, 2017) (citing Provisional Counts of Drug Overdose Deaths as of 8/6/2017, U.S. Center for Disease Control), attached as Exhibit D; see also Overdose Fatalities From Opioids Hit New Peak, W.S.J. (Jan. 6, 2017) (stating that "overdose fatalities [are] reaching new peaks" and that "[t]he synthetic opioid fentanyl, which has up to 50 times the potency of heroin, remains the chief culprit driving the increase in fatalities") (attached as Exhibit E).

The fentanyl crisis has left its imprint in the Eastern District of New York.  In 2015, there were an estimated 154 deaths from synthetic opioids in New York City.  See id.  In the 12 months ending in January 2016, the number of deaths jumped four-fold, to 628.  See id.  The fentanyl crisis is not confined to urban areas of this District.  Fentanyl deaths have also soared on Long Island in recent years.  According to public reporting, in 2016, there were at least 220 fentanyl overdose deaths in Long Island.  See Fentanyl Outpaces Heroin as the Deadliet Drug on Long Island, N.Y. Times (Dec. 28, 2016) (attached as Exhibit F).  Notably, the defendant's subordinates distributed his heroin—more than 40% of which tested positive for fentanyl—in both New York City and Long Island.

The defendant's opioid sales are all the more disturbing because he understood heroin's destructive potential.  Indeed, as noted above, during his post-arrest statements, the defendant acknowledged the dangers of heroin: "I don't use this shit.  I don't touch this shit."  But he did not care about the harm he was causing others, telling agents that he considered heroin a money-making business:  "I don't view it as drugs, I view it as money."

B.    The Need to Protect the Public

The need to protect the public from drug traffickers like the defendant is self-evident.  In addition to the defendant's distribution of heroin and fentanyl, he poses a particular danger to the community because of (1) his affiliation with violent gang members, (2) his possession of firearms and (3) his sexual exploitation of a minor.

1.    The Defendant's Gang Affiliation

As noted above, the defendant is closely affiliated with members of the violent Bloods street gang "Get it in Stacks" (or GI$), including Lashawn Douse (a leading GI$ member) and Joclyn Bridges, a GI$ member with an extensive criminal history.  GI$ controls the drug trade around the Baisely Park Houses and the defendant would not have been able to traffic heroin in the area without the gang's knowledge or approval.  In recent years, GI$ members have engaged in numerous crimes, including drug and firearms trafficking, assault and attempted murder.

15

Members of GI$ promote the gang on social media, including in music videos posted under the username "GIS TV" on YouTube.[8]  Gang paraphernalia, gang colors (Bloods red) and gang signs feature prominently in the music videos, and the lyrics frequently refer to narcotics trafficking and gun violence.  Douse appears in many of the videos.  For example, the video titled "Bustin Off Gats – G.I.S."[9] opens with Douse wearing red-colored sneakers emblazoned with the initials GIS, and shows Douse pointing his finger like a gun into the camera.  In another video, titled "G.I.S. Young & Wild," one of the individuals featured alongside Douse flashes a gang sign commonly known as the "Crip killer."  Screenshots from these videos are attached as Exhibit G.

The defendant's affiliation with GI$ and GI$ members—including Douse—can be seen in a number of these YouTube videos.  For example, the defendant appears in a video on the "GIS TV" channel partially titled "L~Sparks Freestyle" where he raps about killing people while making a shooting gesture with his hands.  At one point the defendant states, "show up at your crib, hoody on, nines out, put them on permanent timeout."  In this lyric, "nines out" refers to nine millimeter handguns, and "put them on permanent timeout" means kill them.  The defendant then states the following:

> telling ni**as suck dick, you know I don't owe ni**as, fuck around and put a clip in one of these old ni**as.  Now I don't fuck with ni**as if I don't feel 'em, you know too much, either you keep 'em or you kill 'em.

There are multiple references to guns and murder in these lyrics.  The defendant says "put a clip in one of these old ni**as" which refers to shooting an individual.  "You keep 'em or you kill 'em" is also a clear reference to murder.  One of the other individuals visible the video can be seen flashing Bloods gang signs.  (A screenshot of this video is attached as Exhibit H.)  The defendant also appears in the video titled "2012 New Years In Baisley GIS Tv," which features a group of young men yelling "GIS" into the camera in a bodega near the Baisley Park Houses.

The defendant's affiliation with GI$ and Douse—and the gun violence they celebrate in their videos—is not limited to YouTube.  Numerous photographs recovered from the defendant's personal cell phone feature him and Douse together.  One such photograph (attached as Exhibit I) shows the defendant, Douse and two other individuals standing on the sidewalk just steps from a residential apartment building.  Douse is wearing a red shit bearing the gang name "Get It In Stacks" and pointing a handgun at the camera.  The defendant stands directly behind Douse holding up his middle finger to the camera.

---

[8] Available at https://www.youtube.com/user/bla808tnm/videos.  Many of the video titles feature the name GI$—such as "All Out by G.I.S.," "Bad Boy By G.I.S.," "DAY IN THE LIFE OF GI$," "C.B.B. T.V Getit in $tacks"

[9] "Gat" is a slang term for a gun.

As noted above, in February 2016, GI$ members Douse and Bridges were arrested in connection with the shooting of a rival Crips gang member by Bridges in an apartment within the Baisley Park Houses.  Shortly after Bridges's arrest, Bridges called the defendant to discuss the fallout from the shooting.  During these calls, the defendant attempted to reassure Bridges by telling him that high-ranking gang members—i.e., "Big Homies"—were handling the situation:  "Big Homies get involved and say, you know, you know, everything is good, everything is good."  The defendant told Bridges that he was relaying "Big Homie's word" and promised him to "get everything double-checked tonight" and "to make sure you're alright."  The defendant's discussion with Bridges shortly after the February 2016 shooting indicates that the defendant was not only affiliated with GI$ members, but also that he was aware of their violent criminal activity.

2.     The Defendant's Possession of Firearms

In addition to his heroin trafficking and affiliation with GI$, the defendant's affinity for firearms makes him an unacceptable danger to the community.  Photographs obtained from the defendant's non-drug cell phone (pursuant to a court-authorized search warrant) establish that he has possessed multiple guns.

In two photographs (attached as Exhibit J), the defendant can be seen sitting in a car holding a silver handgun in his right hand (with his finger on the trigger) while pointing the gun directly at his cell phone camera, which he is holding in his left hand.

Another photograph (attached as Exhibit K) shows a black handgun on a plastic bag and on a porcelain countertop above cracked linoleum tile.  A loaded magazine is visible next to the handgun in one of the photos.  The color of this gun establishes that it is not the same handgun Moran photographed himself holding in Exhibit J.

A series of photographs (attached as Exhibit L) taken on September 7, 2016— shortly before the defendant's arrest—show the defendant holding a large wad of cash and a firearm inside a black plastic bag.  The various angles at which the bag is held confirm that the object inside the bag is a firearm.  (Notably, the linoleum in the photographs matches the linoleum in Exhibit K.)  Attached as Exhibit M are two additional photographs of guns found on the defendant's phone.

The defendant does not dispute that he possessed a least one firearm.  "[I]t is well known that guns are tools of the narcotics trade," United States v. Perez, 135 Fed. Appx. 484, and the defendant's possession of guns underscores his involvement in this trade and highlights the danger he poses to the community.

Significantly, the defendant also expressed an interest in obtaining "clean" out-of-state firearms from the CS.  In April 2016, during a heroin transaction with the CS, the CS raised the prospect of purchasing a gun (i.e., a "clean hammer") from the defendant. In response, the defendant told the CS that if he finds one, he would tell the CS ("If I find

17

some fresh, fresh, I got you"). The defendant then asks the CS if the CS could provide him with a "clean" gun from North Carolina ("But if you can, or somebody can, tell me. Because I need them clean from down there"). The relevant portion of the exchange is set forth here:

| | |
|---|---|
| CS: | Somebody got a clean hammer? But I want a clean one. I don't want a dirty one. |
| DEFENDANT: | Oh you want one? |
| CS: | Yea, not a dirty one, though. |
| DEFENDANT: | If I find some fresh, fresh, I got you. |
| CS: | Yea, I need that. I need that for Long Island. Not for North Carolina. Cause, I can get them in North Carolina. |
| DEFENDANT: | Yea. |
| CS: | North Carolina [unintelligible]. I just don't want to carry—come back up [U.S. Route] 85. |
| DEFENDANT: | But if you can, or somebody can, tell me. Because I need them clean from down there. |

### 3.    Production of Child Pornography

In addition to the evidence of heroin trafficking, gang affiliation and gun possession, agents discovered proof on the defendant's cell phone that he sexually exploited a 16-year-old high school student in February 2016—the same time he claims to have been employed as a youth mentor at the Jacob Riis Settlement Home. Specifically, agents found a video, filmed by the defendant, of the minor performing oral sex on him. The defendant's creation of the video constitutes production of child pornography, in violation of 18 U.S.C. § 2251(a), a charge that carries a mandatory minimum sentence of 15 years' imprisonment. In addition, because the age of consent in New York is 17, the defendant sexual exploitation of the minor constitutes statutory rape under state law.

In the video, the defendant is lying on a bed with his shirt pulled up, his pants pulled down, and his erect penis exposed. While the defendant's face is not visible in the video, his voice can clearly be heard throughout, and the angle of the video leaves no doubt that the defendant is holding the camera. The minor is wearing a black bra in the video and it is unclear whether she is wearing other clothing. At the beginning of the video, just before she begins performing oral sex on the defendant, she looks at the camera says "I feel like a ho." About 15 seconds into the video, the defendant turns on the video camera flash and the minor's face is clearly visible.

The defendant filmed this pornographic video in February 2016, when the minor was 16 years old.[10]  In addition to this video, the minor appears in numerous photographs and videos recovered from the defendant's cell phone, including photographs of her in sexual poses and wearing underwear.  The defendant is present with the minor in certain of these videos and photographs, and can be seen touching and kissing her in some.

There is also clear evidence that the defendant knew that the minor was a high school student.  For example, photographs of the minor taken at her high school were recovered from the defendant's phone, as well as a photograph of the minor wearing a t-shirt featuring the name and logo of her high school.  A video recovered from the defendant's cell phone shows the minor walking around her high school, including the cafeteria which she refers to as the "lunch room."  In addition, the defendant was "friends" with the minor on Facebook, which indicates that he had full access to her Facebook page and indicia of her age.

Any remaining doubts about the nature and longevity of the defendant's sexual relationship with the minor—or doubts about his knowledge of her age—are put to rest by a recorded conversation between the minor and the defendant shortly after his arrest and incarceration in September 2016 (seven months after the defendant filmed the pornographic video).  During that call, excerpted below, the minor refers to the defendant as her "daddy," says she "really misses" the defendant, acknowledges being "underage" (which elicits no surprise from the defendant) and tells the defendant that she is pregnant:

| MINOR: | Hello. |
|---|---|
| DEFENDANT: | Yo, where the fuck you been at, man? |
| MINOR: | Babe, I'm so sorry.  I had left my phone upstairs, and I didn't see that you called me so many times. . . . |
| DEFENDANT: | What's wrong with you? |
| MINOR: | I was trying, because I missed your calls and felt so sad. |

. . .

| DEFENDANT: | I just miss everything about you babe.  I need you to go to Walgreens and develop me some pictures |

---

[10] There is clear evidence that the defendant filmed the video in 2016.  A date stamp of February 16, 2016 appears on the screen during the entirety of the video and a television commercial visible in the background advertises the release of a movie, "Triple 9," on February 26, which public sources establish was released on February 26, 2016.

|  | too, word. . . .  I don't know if they can be too nasty, ok, I don't know if they can be too nasty, but , you know, develop me some nice pictures, man.  I need that. |
|---|---|

. . .

| MINOR: | I know, I know you think I'm not gonna hold you down, but I'm gonna hold you down, babe. |
|---|---|
| DEFENDANT: | Babe, you young, I need you to just go, go do, do, do what's best for you, you understand? |

. . .

| MINOR: | Babe, I love you so much.  I'm so sorry this happened to you, you have no idea, I really feel so bad. . . .  it's not like I can come see you, or nothing, because I can't because I'm underage. |
|---|---|
| DEFENDANT: | No you can come. |
| MINOR: | I'm 17. |
| DEFENDANT: | You can come, you can come see me. |

. . .

| MINOR: | I'm inside the new school now.  And I'm gonna start next Monday, and I know I can't have the phone inside the building, so I would love if you could call me at 2, 3 . . . . |
|---|---|

. . .

| MINOR: | I gotta tell you one more thing, real fast. . . .  I think I'm pregnant, I'm not gonna lie. |
|---|---|
| DEFENDANT: | [Sighs] Hello? |
| MINOR: | Yeah, I think I'm pregnant, but— |
| DEFENDANT: | I'm gonna email you . . . |
| MINOR: | All right, I love you daddy. |
| DEFENDANT: | I love you.  Hold on, you think?  Well? |

The defendant's sexual exploitation of the minor is criminal and disturbing in its own right. But what makes the exploitation all the more alarming is the defendant's purported history working with children and adolescents. In his letter to the Court, the defendant emphasizes his purported work at "summer camp," "in a middle school" and at an "afterschool program." (Def. Mem. Ex. I at 3.)

Some of the letters appended to the defendant's sentencing memorandum are unsettling in light of the defendant's sexual relationship with the minor. For example, one individual praised the defendant for "volunteer[ing] his personal time to take our youth on college trips, job hunting, overnight camping and amusement parks." The prospect of the defendant chaperoning teenagers on overnight trips is highly troubling in light of his sexual exploitation of the minor.

V.    Conclusion

As explained above, the defendant ran a heroin trafficking business near the Baisley Park Houses in Jamaica, Queens, while associating with violent Bloods gang members and possessing multiple firearms. And despite his purported commitment to children, the defendant has sexually exploited at least one high school-age girl. Given the seriousness of his crimes and the need to protect the community, the government respectfully submits that a Guidelines term of imprisonment is appropriate.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:    _____/s/_____
Matthew J. Jacobs
Assistant U.S. Attorney
(718) 254-6401